**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **PAMELA PRICE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 4:14cv0802 TCM** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying

the application of Pamela Price (Plaintiff) for disability insurance benefits (DIB) under Title

II of the Social Security Act (the Act), 42 U.S.C. § 401-433, is before the undersigned by

written consent of the parties. See 28 U.S.C § 636(c).

## Procedural History

Plaintiff applied for DIB in October 2011, alleging she was disabled as of October 22,

2010, because of arthritis, blood clots, and knee problems. (R.[1] at 95-98, 125.) Her

application was denied initially and after a March 2013 hearing before Administrative Law

Judge (ALJ) James K. Steitz. (Id. at 6-18, 22-36, 45-50) The Appeals Council denied

Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of

the Commissioner. (Id. at 1-3.)

---

[1]References to "R." are to the administrative record filed by the Commissioner with her
answer.

## Testimony Before the ALJ

Plaintiff, represented by counsel, was the only witness to testify at the administrative hearing.

Plaintiff was forty-eight years old at the time of the hearing. (Id. at 24.) She is 5 feet 6 inches tall and weighs approximately 240 pounds. (Id. at 26.) She graduated from high school, and was in special education classes for math, spelling, and reading. (Id. at 24-25.) She still has problems pronouncing certain words. (Id. at 25.) She does not have any difficulties reading or doing arithmetic, with the exception of division problems. (Id.)

Asked why she is no longer able to work full-time, Plaintiff explained that she is in constant pain. (Id. at 26.) The pain is worse in her knees, the left more than the right. (Id.) She has had problems with her knees since 2004. (Id.) She has had three surgeries each on both knees, and has to have another left knee replacement. (Id. at 27.) Her knee pain limits her ability to do housework. (Id.) She cannot stand in one place for longer than fifteen minutes before having to sit down. (Id. at 27-28.) She cannot walk for longer than twenty minutes. (Id. at 28.) She cannot squat. (Id.) If she drops something, she has to leave it where it fell. (Id.) Sometimes, her knees give out on her when she is walking around and she falls. (Id.) This happened a couple of weeks earlier. (Id.)

Plaintiff lives in a one-story house with a basement. (Id. at 29.) She cannot go up and down the stairs to the basement. (Id.)

To relieve her knee pain, Plaintiff takes medication and lies down two to three times a day for two to three hours. (Id.)

In addition to knee pain, Plaintiff has pain in her lower back. (<u>Id.</u>) This pain has existed "[f]or quite some years," but has become "[r]eally bad" in the last two or three years. (<u>Id.</u> at 29-30.) The pain limits her bending, standing, and sitting. (<u>Id.</u> at 30.) The longest she can sit is twenty minutes before having to stand up and stretch. (<u>Id.</u>)

Plaintiff takes medication for deep vein thrombosis (DVT) in her legs. (<u>Id.</u>) She has done so since 2007. (<u>Id.</u> at 31.) And, she has asthma that causes her to be short of breath if she walks too far or tries to do something around the house, e.g., washing dishes or making up the bed. (<u>Id.</u>) Her husband does most of the cleaning around the house. (<u>Id.</u>) If he uses chemicals, she has to go into another room. (<u>Id.</u>) When they go grocery shopping, her husband puts things in the basket and she rides in the cart. (<u>Id.</u> at 32.) She has only driven twice since her knee surgery. (<u>Id.</u>)

Her medications cause side effects of drowsiness and dizziness. (<u>Id.</u>) She has complained of these to her doctor, but he has not changed anything. (<u>Id.</u>)

Asked about hobbies that she used to enjoy but no longer does, Plaintiff testified that she can no longer enjoy dancing or playing baseball and kick-ball. (<u>Id.</u> at 33.) She cannot pick up her three-year old step-granddaughter. (<u>Id.</u>)

Plaintiff also testified that she worked for the Army for twenty-seven years, but the job moved to Kentucky in 2010. (<u>Id.</u> at 34.) She was given a chance to move with the job. (<u>Id.</u>) Asked if she thought about applying for federal disability, Plaintiff replied that she had but the job had then moved out of town. (<u>Id.</u> at 34-35.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's application, school records, records from health care providers, and assessments of her physical restrictions.

When applying for DIB, Plaintiff completed a Disability Report, disclosing that she stopped working on October 22, 2010, because of her condition. (Id. at 125.) She was 5 feet 9 inches tall and weighed 260 pounds. (Id.) She had completed the twelfth grade, and had not been in special education classes. (Id. at 125-26.) From October 1983 to October 2010, she worked as a personnel technician for the government. (Id. at 126.) She did not otherwise describe the job. (Id. at 127.) On a Work History Report, she described the job as working on computers, answering telephones, making copies, typing, and other miscellaneous duties. (Id. at 159.) During the day, she walked for three hours, stood for two, sat for three, and stooped for one. (Id.) The heaviest weight she lifted was ten pounds; the weight she frequently lifted was less than ten pounds. (Id.)

Plaintiff also completed a Function Report. (Id. at 145-50.) Asked to describe what she does during the day from when she wakes up until she goes to bed, Plaintiff reported that she eats breakfast, watches television, prepares dinner around four o'clock, eats, watches television until bedtime, takes a shower, and goes to bed. (Id. at 145.) Her husband feeds their dog. (Id. at 146.) Her impairments prevent her from sleeping well. (Id.) She is slower when dressing and bathing. (Id.) She needs reminders to take medication. (Id. at 147.) She prepares simple meals, e.g., sandwiches and frozen dinners. (Id.) The only household chore

she does is dusting. (Id.) This takes about an hour once a week. (Id.) Her hobbies include watching television and going to church. (Id. at 149.) Her impairments adversely affect her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and complete tasks. (Id. at 150.) She cannot not walk farther than one-quarter mile before having to stop and rest for several minutes. (Id.) As long as she is not in pain, she can pay attention indefinitely. (Id.) She can follow written and spoken instructions well. (Id.) She gets along well with authority figures. (Id. at 151.) She can handle changes in routine, but not stress. (Id.) She uses a cane and wears glasses. (Id.)

When interviewed when applying for DIB, it was noted that Plaintiff was polite and helpful during the 90-minute interview, had appropriate appearance and grooming, and had problems standing up from the chair. (Id. at 122.) The interviewer also remarked that "no degree of limitation noted." (Id.)

Plaintiff's records from the Special School District of St. Louis County list a May 1981 verbal intelligence quotient (IQ) score of 64 on the Wechsler Intelligence Scale for Children – Revised (WISC-R), a performance IQ of 87, and a full scale IQ of 73, placing her within the borderline range of intelligence. (Id. at 182, 183.) It was noted that she could "attend to a specific task for a 30 minute period." (Id. at 183.) At sixteen, she was functioning at a 2.7 grade level in written expression and spelling, a 4.3 level in mathematics, and a 3.4 level in reading. (Id. at 185.) She was diagnosed as mentally retarded. (Id.)

The relevant medical records before the ALJ are summarized below in chronological order.

On January 6, 2009, Plaintiff complained to Timothy Jennings, D.O., of right calf pain for the past two days. (Id. at 282.) Tests revealed DVT. (Id.) Plaintiff elected to be treated as an outpatient and was started on a blood thinner, Coumadin. (Id.) She was also prescribed Vicodin for pain. (Id.) Six days later, her right leg was still a little tender to palpation, but the right calf was of the same diameter as the left. (Id. at 281.) She was continued on the Coumadin. (Id.)

Plaintiff saw Dr. Jennings on January 28 about a persistent cough and was diagnosed with an upper respiratory infection. (Id. at 280.)

In March, Plaintiff consulted an orthopedist, Lyndon B. Gross, M.D., Ph.D., about the pain caused by her right knee chondromalacia (damage to the cartilage under the kneecap). (Id. at 357-58.) She was described as "failing nonoperative management." (Id. at 357.) Surgical intervention was discussed with the goal of lessening her pain. (Id. at 358.) It was anticipated that surgery would not halt the degeneration of her knee. (Id.)

After Dr. Gross again examined Plaintiff on April 30, the recommendation of surgery was renewed. (Id. at 354-56.) Surgery – a right knee arthroscopy; chondroplasty medial femoral condyle, lateral tibial plateau, patella, trochlear groove; limited synovectomy – was performed on May 13. (Id. at 351-53.) Plaintiff's post-operative diagnoses were right knee grade III chondromalacia medial femoral condyle, grade III chondromalacia lateral tibial plateau, grade II chondromalacia patella, and grade III chondromalacia trochlear groove. (Id. at 351.)

When seen by Dr. Gross on May 26, Plaintiff had some swelling of her right knee, but had a range of motion from 0 to 90 degrees. (Id. at 350.) She had normal sensation and normal motor function in the femoral, tibial, and peroneal nerve distribution. (Id.) She was started on a nonsteroidal anti-inflammatory drug (NSAID) and was to aggressively work on regaining a full range of motion and strength in her knee. (Id.)

Plaintiff reported to Dr. Gross on June 23 that she thought her right knee was improving, but she was still having some pain in both knees. (Id. at 349.) The range of motion in her right knee had increased to being from 0 to 120 degrees. (Id.) On examination, she had some tenderness to palpation over the medial aspect of the knee. (Id.) Dr. Gross advised her to continue taking an NSAID and to do a strengthening program. (Id.)

Plaintiff saw Dr. Jennings in July about her elevated blood pressure. (Id. at 278.) Her dosage of Bystolic, a beta blocker used to treat hypertension, was increased. (Id.)

On August 3, she consulted Dr. Jennings about pressure in her right ear and muffled hearing. (Id. at 277.) Dr. Jennings noted that Plaintiff had not consulted the orthopedist, Dr. Farley, she had been referred to at the last visit. (Id.)

The next day, Plaintiff returned to Dr. Gross, reporting that her right knee was doing well but her left knee felt somewhat painful and as if it was going to give way. (Id. at 347-48.) She had a range of motion in each knee from 0 to 120 degrees. (Id. at 347.) She also had some tenderness to palpation over the left knee but not the right knee. (Id.) Dr. Gross discussed with her the degeneration in her left knee and that it would not be unreasonable to

try physical therapy to try to strengthen the muscles. (Id.) Other measures, including a corticosteroid injection or knee arthroplasty, were discussed. (Id. at 347-49.)

Also on August 4, Plaintiff was seen by Mitchell B. Rotman, M.D., another orthopedist in Dr. Gross' practice, for evaluation of a ganglion in her right wrist. (Id. at 346.) The ganglion was aspirated and imploded. (Id.)

In September, Plaintiff had a neoplasm, or tumor, consistent with a ganglion cyst excised from her right wrist. (Id. at 287-92.)

In December, she saw Dr. Jennings for an upper respiratory infection and was prescribed an antibiotic. (Id. at 275.)

Chest x-rays taken in January 2010 to investigate Plaintiff's complaints of shortness of breath were normal. (Id. at 293-94.)

On February 1, Plaintiff returned to Dr. Gross for further evaluation of her left knee pain. (Id. at 344-45.) On examination, Plaintiff had a range of motion in her right knee from 0 to 125 degrees and in her left from 0 to 120. (Id. at 344.) She had pain in the left knee, but not in the right, when the knee was flexed and with patella mobilization. (Id.) X-rays of the left knee showed changes consistent with a proximal tibial osteotomy and degenerative changes in the tibiofemoral and patellofemoral compartments. (Id. at 345.) X-rays of the right knee showed some degenerative changes in the tibiofemoral and patellofemoral compartments. (Id.) There were no fractures or dislocations in either knee. (Id.) Dr. Gross diagnosed Plaintiff with degenerative joint disease in each knee, noting that she was more symptomatic in her left knee than in her right. (Id.) Dr. Gross recommended surgical

intervention in addition to NSAIDs and a chondroprotective supplement.  (Id.)  He also recommended exercise and weight loss.  (Id.)  Three weeks later, Plaintiff had a viscosupplementation injection.  (Id. at 343.)

Three days after the injection, on February 25, Plaintiff saw Dr. Jennings for complaints of congestion, a dry cough, and hoarseness for the past seven days.  (Id. at 703-04.)  She was given a prescription for Allegra.  (Id. at 704.)

On April 19, Plaintiff reported to Dr. Gross that she had had some improvement in her left knee pain.  (Id. at 342.)  He informed her that he would refer her to a doctor specializing in knee reconstructive procedures in younger patients if she continued to be symptomatic.  (Id.)

On May 5, Plaintiff complained to Dr. Jennings of a dry cough for the past ninety days and was diagnosed with an upper respiratory infection.  (Id. at 270-72, 700-01.)  On examination, it was noted that Plaintiff had degenerative joint disease of both knees but had been told by her orthopedist that she was too young for knee replacements.  (Id. at 271.)  She was going to apply for disability.  (Id.)

After seeing Dr. Jennings on May 20 and having lab work done, Plaintiff returned on May 26, complaining of a sore throat, productive cough, and fever for the past thirty days.  (Id. at 267-69, 689-98.)  She was prescribed Tessalon, a non-narcotic cough medicine.  (Id. at 269.)  Plaintiff returned to Dr. Jennings on June 11, reporting that she was out of the cough medicine and it did not appear to have helped.  (Id. at 265-66, 684-87.)  Plaintiff was given

an injection of methylprednisolone, a steroid, and was scheduled for a chest x-ray.  (Id. at 266.)

Plaintiff was seen by Richard A. Summa, M.D., on July 14 for her complaints of a chronic cough.  (Id. at 259-64, 463-68.)  Dr. Summa noted that pulmonary function tests had revealed mild obstructive lung disease but no restrictive lung disease.  (Id. at 263, 297, 452-53, 444-4.)  A methacholine challenge had revealed asthma.  (Id. at 263, 296, 448-49.)  Chest x-rays were normal.  (Id. at 263.)  Allergy tests were negative.  (Id. at 468, 470-74.)  He opined that her chronic cough was probably due to her asthma, and prescribed her asthma maintenance medications, Symbicort and Singulair, as well as albuterol and a tapering dose of prednisone.  (Id. at 263, 264.)  Plaintiff was continued on Coumadin.  (Id.)

When Plaintiff saw Heather K. O'Toole, M.D., on July 22, she reported having had a sore throat, cough, congestion, and postnasal drip for the past three days.  (Id. at 257-59, 678-83.)  She had not tried any of the medications prescribed by Dr. Summa.  (Id. at 257.)  She was diagnosed with an upper respiratory infection and prescribed Fluticasone Propionate (for asthma) and azithromycin (an antibiotic).  (Id. at 259.)

On August 6, Plaintiff returned to Dr. Summa, reporting that she was still coughing every day and was recently hoarse.  (Id. at 251-56, 435-41.)  Her body mass index (BMI) was 43.36.[2]  (Id. at 441.)  On examination, her chest wall was unremarkable and her lungs were clear.  (Id. at 253.)  She had no wheezes or crackles.  (Id. at 254.)  Dr. Summa noted that a

_____

[2]A person with a BMI higher than 30 is considered obese.  Centers for Disease control and Prevention, About BMI for Adults, http://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/ (last visited April 9, 2015).

computed tomography (CT) scan of her sinuses had revealed a mucous retention cyst, but otherwise clear sinuses. (Id. at 254, 300, 457-60.) Plaintiff was diagnosed with chronic cough and rhinitis in addition to her previously-diagnosed asthma and venous thromboembolism. (Id. at 254.) She was continued on the Symbicort and Singulair for her asthma and was additionally prescribed one course of prednisone. (Id. at 255, 256.)

When next seeing Dr. Summa, on August 24, Plaintiff had a CT scan of her chest; it was unremarkable. (Id. at 245-50, 302, 427, 418-24, 430, 456.) She was scheduled for a bronchoscopy. (Id. at 250.) Subsequently, on September 13, Plaintiff had a fiberoptic bronchoscopy which was unremarkable and failed to identify a cause or etiology for her cough. (Id. at 304-08.)

Plaintiff again saw Dr. Summa on October 6. (Id. at 240-45, 408-15.) Plaintiff was to follow-up in six months or as needed for her acute respiratory symptoms or for an acute exacerbation of her asthma. (Id. at 244.) Dr. Summa discussed with Plaintiff the importance of a regular exercise regimen. (Id. at 245.) He also noted that Plaintiff had "not been using her asthma medications to maximum benefit." (Id.) He prescribed her hydrochlorothiazide (HCTZ), a diuretic used to treat hypertension. (Id.)

Plaintiff returned to Dr. Summa in one month. (Id. at 233-39, 398-406.) He noted that she had "been tolerating all of her usual activities of daily living without any significant respiratory limitations." (Id. at 234.) She had also been using her rescue inhaler two or three times a day, but had run out of Spiriva and Singulair. (Id.) Her blood pressure was stable on

the HCTZ.  (Id. at 237.)  Dr. Summa noted that Plaintiff's cough was "much better with treatment."  (Id. at 239.)

Plaintiff saw Dr. Jennings on November 22 for complaints of right elbow pain with no known injury.  (Id. at 676-78.)  She was diagnosed with tennis elbow and told to apply ice and rest.  (Id. at 676-77.)

Plaintiff next saw Dr. Summa in February 2011.  (Id. at 226-33, 386-94.)  He noted that the fiberoptic bronchoscopy was unremarkable.  (Id. at 226.)  Her cough was continuing to improve.  (Id.)  She reported that she had not been taking her evening dose of Symbicort for the past few weeks and had forgotten about it until then.  (Id.)  As a result of not taking the Symbicort, she had had to use her rescue inhaler several times at night.  (Id.)  Her exercise tolerance had increased, but she was still becoming short of breath on exertion.  (Id.)  She promised to start regularly walking when the weather improved.  (Id.)  Dr. Summa noted that Plaintiff's cough was "very well controlled" when she took Symbicort as prescribed.  (Id. at 230.)  He also noted that Singulair could be added back into her medication regimen if her cough did not respond to Symbicort alone.  (Id.)

Plaintiff went to the emergency room at SSM DePaul Health Center (DHC) on August 8 after feeling dizzy for the past three days and feeling like she was going to pass out that day. (Id. at 309-20.)  The feelings were exacerbated by movement and alleviated by rest.  (Id. at 310.)  On examination, she had a normal range of motion, motor skills, sensation, strength,

and reflexes.  (Id.)  Straight leg raises were normal.[3]  (Id.)  She was alert and oriented to time, place, and person.  (Id.)  Her affect and judgment were normal.  (Id.)  An electrocardiogram (ECG) was also normal, as were chest x-rays and a CT scan of her brain.  (Id. at 313, 315, 317-18.)  Six and a half hours after arrival, Plaintiff was no longer dizzy.  (Id. at 315.)  She was prescribed meclizine (an anti-vertigo medication), discharged, and encouraged to keep her primary care physician appointment the next day.  (Id.)  Plaintiff did, seeing Dr. Jennings and having a normal examination.  (Id. at 664-66.)

Four days later, when seen by Dr. Summa, Plaintiff was described as having no significant limitations from a respiratory standpoint.  (Id. at 218-24, 376-84.)  With daily use of Symbicort, Plaintiff had had to use a rescue inhaler less than once a week.  (Id. at 219.)  She was limited, however, by bilateral knee discomfort due to osteoarthritis and degenerative joint disease.  (Id.)  She anticipated having to have knee replacements soon.  (Id.)  Her blood pressure remained stable with the HCTZ.  (Id. at 223.)  Chest x-rays and pulmonary function tests were normal.  (Id. at 322, 324-25, 371-72.)  Weight loss – she then weighed 260 pounds – and exercise were discussed.  (Id. at 224.)  She understood the need for both.  (Id.)

Plaintiff saw Dr. Jennings on August 19 for complaints of back pain that had suddenly begun the day before when she was making up her bed.  (Id. at 661-63.)  On examination, she appeared to be in moderate pain and was tender over her lumbosacral spine with light

---

[3]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended."  **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 (8th Cir. 2009) (internal quotations omitted).

palpation and forward bending. (Id. at 661.) Straight leg raises were negative; she had normal motor strength and sensation and a normal heel and toe gait. (Id.) She was diagnosed with lower back pain and prescribed cyclobenzaprine, a muscle relaxant, and hydrocodone-acetaminophen. (Id.)

Plaintiff returned to Dr. Jennings five days later for complaints of low back pain for the past two weeks that radiated down her legs and was unrelieved by the medication. (Id. at 217, 657-60.) Her BMI was 41.74. (Id. at 217.) Straight leg raises were positive on the right and she had paravertebral tenderness of her lumbar spine. (Id.) She was to be scheduled for a magnetic resonance imaging (MRI) of her lumbar spine. (Id.)

In September, Plaintiff underwent a diagnostic arthroscopy, partial medial meniscectomy, and chrondroplasty of the medial femoral condyle and patella by Terry Weis, D.O., to repair a torn right medical meniscus. (Id. at 338.) When seen by Dr. Weis the next week, Plaintiff's right knee was described as being in good position and healing. (Id. at 337.) Plaintiff was "[a]mbulating quite well." (Id.) On October 6, she had "full and unrestricted range of motion in her knee" and minimal effusion. (Id.) She was prescribed an NSAID and was to return in three weeks. (Id.) She did, and was diagnosed with continuing bilateral tenosynovitis (an inflamed tendon) and degenerative arthritis of her knee. (Id. at 336.) She was prescribed a different NSAID, Mobic, and was to return in one month. (Id.)

Before last seeing Dr. Weis, Plaintiff reported to Dr. Jennings on October 27 that she could not get the MRI done because of claustrophobia. (Id. at 216, 653-56.) On examination, straight leg raises were positive bilaterally; her lumbosacral spine had paravertebral

tenderness; and she had normal strength, sensation, peripheral pulses, and toe and heel gait. (Id. at 216.) There was no pedal edema, clubbing, or cyanosis. (Id.) She was diagnosed with lower back pain and claustrophobia and prescribed cyclobenzaprine, a muscle relaxant; Xanax, used to treat anxiety and depression; and hydrocodone-acetaminophen, a pain reliever. (Id.) Plaintiff was going to try taking Xanax before the rescheduled MRI. (Id.) The MRI was then done, revealing a disc bulge eccentric to the left at L4-L5 and L5-S1 levels, resulting in a mild central canal stenosis, a moderate left lateral recess stenosis, and a mild right lateral recess stenosis secondary to facet arthropathy. (Id. at 543-45, 646-48.) Also, disc disease and face arthropathy resulted in mild to moderate neural foraminal narrowing bilaterally at L5-S1. (Id. at 545.) Facet arthropathy was the main cause of mild foraminal stenosis at L3-L4 and L4-L5 bilaterally. (Id.)

Plaintiff saw Dr. Jennings again on November 28, complaining of congestion, a productive cough, and a sore throat. (Id. at 634-36.) She was diagnosed with an upper respiratory infection and prescribed Zithromax, an antibiotic, and guaifenesin-codeine, an expectorant. (Id. at 634.) She was to return as needed. (Id. at 635.)

Plaintiff went to the DHC emergency room on December 2 for complaints of neck pain after the car in which she was a passenger was rear-ended when stopped. (Id. at 537-42.) X-rays of Plaintiff 's cervical spine showed degenerative changes at C5-C7, but no fracture. (Id. at 541-42.)

Plaintiff complained to Dr. Jennings on January 9, 2012, of low back pain for the past month with no known cause. (Id. at 630-33.) She appeared to be in mild pain and had

tenderness and severe pain to even light palpation over the midline of her lumbosacral spine area.  (Id. at 630-31.)  She was diagnosed with low back pain and prescribed hydrocodone-acetaminophen.  (Id. at 631.)

On January 23, at Dr. Jennings' request, Plaintiff was seen by Stephen G. Smith, M.D., who specialized in pain management, for evaluation of her low back and bilateral leg pain.  (Id. at 612-13, 746-47.)  Also, Plaintiff reported having occasional numbness and tingling in her low back.  (Id. at 612.)  She sometimes walked with a forward flexed gait.  (Id.)  Her pain increased with standing, walking, bending, and lifting, and decreased with lying down, Vicodin, and, sometimes, sitting.  (Id.)  On examination, Plaintiff had an "OK" range of motion in her neck and upper extremities.  (Id.)  Also in her upper extremities, her motor strength was full and her sensory exam was intact.  (Id.)  Straight leg raises were negative.  (Id.)  Patrick's maneuver was negative bilaterally.[4]  (Id.)  She did not have any trigger points.  (Id.)  Dr. Smith diagnosed Plaintiff with lumbar spinal stenosis, lumbar spondylosis, and lumbar radiculopathy.  (Id.)  He started Plaintiff on Neurontin and amitriptyline and physical therapy two to three times a week for four to six weeks.  (Id. at 612-13.)

Two days later, Plaintiff saw Dr. Summa for a routine pulmonary follow-up and evaluation of her chronic cough.  (Id. at 361-69.)  He described the cough as resolved and Plaintiff as having no acute respiratory complaints.  (Id. at 361.)  Plaintiff reported that she

---

[4]A positive Patrick's sign, or maneuver, indicates the presence of sacroiliac joint dysfunction in patients with lower back pain.  Patrick's Test: Evaluation of Sacroiliac Joint Dysfunction, http://centenoschultz.com/patricks-test-evaluation-of-sacroillac-joint-dysfunction (last visited April 9, 2015).

had been using her rescue inhaler less than once a week and had not been using the Symbicort as prescribed.  (Id.)  Dr. Summa noted that Plaintiff's cough had persisted despite various treatments until her ARB (angiotensin receptor blocker used to treat hypertension) drug had been stopped.  (Id.)  That had helped eliminate the coughing.  (Id.)  On examination, Plaintiff denied any acute or chronic sinus congestion or drainage.  (Id. at 362.)  She occasionally had post nasal drip and rhinorrhea, but had never been diagnosed with, or treated for, allergic rhinitis or hayfever.  (Id.)  Dr. Summa noted that Plaintiff was to have both knees replaced the next month.  (Id.)   Also, she had some complaints of low back pain that were going to be addressed after her knee surgery.  (Id.)  Plaintiff's prescription for Symbicort was renewed at a decreased dosage.  (Id. at 368.)  Plaintiff was to use an incentive spirometer at least four times a day to increase her lung volume until she was able to regularly exercise following her knee surgery.  (Id.)  She was to return in six months.  (Id.)

The next day, Plaintiff was seen at the DHC emergency room for complaints of right upper quadrant abdominal pain that had begun four days earlier and had been accompanied four times by vomiting.  (Id. at 518-28.)   The pain, a nine on a ten-point scale, was exacerbated by exercise and lying down and alleviated by nothing.  (Id. at 519.)   On examination, Plaintiff had a normal range of motion in her neck and a normal gait and muscle tone.  (Id. at 521.)  Her mood, memory, affect, and judgment were also normal.  (Id.)  She was tender in the upper right abdominal quadrant.  (Id.)  A CT scan and x-rays of her chest were normal.  (Id. at 525, 527-28.)  A CT scan of her abdomen and pelvis was consistent with cholecystitis (inflammation of the gallbladder).  (Id. at 525, 528.)  Plaintiff was prescribed

oxycodone-acetaminophen and promethazine and told to followup with the consulting physician, Tauqir Ahmed, M.D.  (Id. at 526.)

Three days later, on January 30, Plaintiff was admitted to DHC after returning to the emergency room with complaints of increasing pain associated with nausea and fever.  (Id. at 491-517.)  A CT scan of her abdomen and pelvis showed acute cholecystitis.  (Id. at 493, 496, 501, 507.)  X-rays and a CT scan of her chest were negative, including for a pulmonary embolism.  (Id.)  An ultrasound of her abdomen showed cholelithiasis (gallstones).  (Id.) Plaintiff underwent a laparoscopic cholecystectomy (removal of the gallbladder), laparoscopic removal of adhesions that were covering the gallbladder, and a laparoscpic drainage of the right upper quadrant abscess.  (Id. at 496, 501, 507.)  At discharge on February 5, Plaintiff was to start taking Augmentin for seven days, continue taking oxycodone-acetaminophen and citalopram, with no refills, and her other medications of promethazine, albuterol, Symbicort, Elavil, gabapentin, Coumadin, and HCTZ.  (Id. at 497, 502.)  She was to stop taking hydrocodone-acetaminophen.  (Id.)  She was also to gradually increase her activity, was not to lift anything heavier than ten pounds until her next appointment in one week, and was to follow a low fat diet.  (Id. at 500, 503, 509.)

Plaintiff saw Dr. Jennings on February 22 to be cleared for knee surgery after having the gallbladder surgery.  (Id. at 607-11.)  On examination, she had marked degenerative joint disease in each knee.  (Id. at 609.)  Her back was "unremarkable"; straight leg raises were negative.  (Id.)  Plaintiff indicated she would consider physical therapy.  (Id.)  Dr. Jennings

recommended waiting awhile before considering knee surgery and following-up with him in three months or sooner if needed. (Id.)

Plaintiff saw Dr. Weis on May 7 for treatment of a painful right wrist ganglion cyst. (Id. at 576-78.) She was given a prescription for Mobic, a NSAID, and was to return in one month. (Id. at 576.) Plaintiff returned on May 21, and was described as having healing tenosynovitis and "a dull achy pain in her wrist over the mass with no neurologic and tendon deficit." (Id. at 573-75.) Dr. Weis noted that Plaintiff would be returning in one week for a total knee replacement. (Id. at 573.)

On May 30, Plaintiff was admitted to DHC for a total right knee replacement. (Id. at 484-90.) During her four-day hospital stay, Plaintiff made good progress with physical therapy. (Id. at 487.) Her pain was controlled with medication. (Id.) At discharge on June 2, Plaintiff was prescribed oxycodone-acetaminophen (Percocet) to be taken every six hours as needed. (Id.) She was to follow-up with Dr. Weis in two weeks. (Id. at 489.)

X-rays taken when Plaintiff returned for the follow-up appointment and reported an increase in the pain over the medial aspect of her knee showed good bone density and no subluxation or dislocation. (Id. at 569-72.) Dr. Weis noted that Plaintiff had taken no medications for three days. (Id. at 569.) He prescribed her Percocet for discomfort. (Id.)

On June 5, Plaintiff complained to Dr. Jennings of right calf pain. (Id. at 597-601.) On examination, she had severe tenderness at the calf. (Id. at 599.) She reported that Perocet helped. (Id.) An ultrasound of Plaintiff's right lower extremity revealed no evidence of an acute deep or superficial venous thrombosis. (Id. at 481-83, 602-06.)

Plaintiff returned to Dr. Weis on July 2. (Id. at 565-68.) The range of motion in her right knee was 3 to 80 degrees. (Id. at 566.) She had "[m]uch less pain and swelling." (Id.) She was encouraged to do her range of motion exercises and prescribed Percocet for discomfort. (Id.)

When next seeing Dr. Weis, on July 23, Plaintiff had a range of motion in her right knee from 0 to 95 degrees. (Id. at 562-64.) On August 20, however, the range was reduced to 0 to 90 degrees. (Id. at 558-61.) She was released from limited activity and was to return in one month. (Id. at 559.)

The same day, Dr. Weis signed on Physician's Statement for Disabled License Plates on Plaintiff's behalf. (Id. at 548.) He checked the box labeled "Permanent Disability" and the box by a definition of disability as being the person cannot walk 50 feet without stopping "due to a severe and disabling arthritic, neurological, orthopedic condition, or other severe and disabling condition." (Id.)

Plaintiff had "dull achy sharp pain in her [right] knee with neurologic tendon deficit" and a range of motion from 3 to 85 degrees on September 19. (Id. at 555-57.) Dr. Weis instructed her to "get vigorous about her range of motion exercises" and return in one month. (Id. at 555.)

At her next, October 18 visit, Plaintiff still had the pain in her right knee. (Id. at 551-54.) She was taking Aleve twice a daily. (Id. at 551.) She was to return in six months. (Id.)

Plaintiff consulted Dr. Jennings in January 2013 for low back pain for the past month. (Id. at 594-96.) On examination, she appeared to be in mild pain. (Id. at 594.) Straight leg

raises were negative; motor strength and sensation were normal; heel and toe gait was normal. (Id.)  She could stand with the ankle dorsiflexed and plantar flexed.  (Id.)  Plaintiff was diagnosed with low back pain and prescribed cyclobenzaprine and hydrocodone-acetaminophen.  (Id.)

On February 5, Plaintiff was seen by Dr. Summa for a routine pulmonary follow-up and evaluation and had a pulmonary function test, resulting in a diagnosis of mild obstructive lung disease with a minimal reversible component and no restrictive lung disease.  (Id. at 724-43.)  The findings of the test were "consistent with some progression of the mild obstructive disease and a decrease in gas transfer capacity."  (Id. at 725.)  Chest x-rays to investigate Plaintiff's complaints of shortness of breath showed a normal heart size, clear lungs, and no pneumothorax or pleural effusion.  (Id. at 729.)  Dr. Summa noted Plaintiff's complaints of increased wheezing and shortness of breath since her dosage of Symbicort was reduced.  (Id. at 734.)  He also noted that she had been tolerating her usual activities of daily living without any significant respiratory problems.  (Id.)  She was limited, however, by bilateral knee discomfort due to her osteoarthritis and degenerative joint disease.  (Id.)  She had had one knee replaced and needed to have the other replaced.  (Id.)  She had been using her rescue inhaler three to four times a day.  (Id.)  Dr. Summa increased her dose of Symbicort and instructed Plaintiff to start taking Singular every day.  (Id. at 742.)  She was to try to regularly and daily exercise to increase her pulmonary conditioning.  (Id.)  She was to return in two months or sooner if needed.  (Id. at 743.)

Also before the ALJ was the physical residual functional capacity (PRFC) assessment of Plaintiff by Brittany Hamilton, a single decision-maker.[5] (Id. at 37-44.) The primary diagnosis was asthma; the secondary diagnoses were osteoarthrosis and allied disorders. (Id. at 39.) All were severe, but none satisfied Listing 1.02 (dysfunction of major joints). (Id.) These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and, stand, walk, or sit for approximately six hours in an eight-hour day. (Id. at 40-41.) Her ability to push or pull was otherwise unlimited. (Id.) She had one postural limitation, i.e., she should only occasionally climb ramps, stairs, ladders, ropes, or scaffolds. (Id. at 41.) She had no manipulative, visual, or communicative limitations. (Id.) She had environmental limitations of needing to avoid concentrated exposure to extreme cold or heat, humidity, fumes, dusts, gases, poor ventilation, and hazards. (Id. at 42.)

Marcia Lipski, M.D., wrote on April 17, 2012, that she agreed with Ms. Hamilton's PRFC and further noted that Plaintiff is morbidly obese. (Id. at 339.)

### The ALJ's Decision

The ALJ first determined that Plaintiff met the insured status requirement of the Act through December 31, 2015, and had not engaged in substantial gainful activity since her alleged onset date of October 22, 2010. (Id. at 11.) He next found that Plaintiff had severe

---

[5]See 20 C.F.R. § 404.906 (defining role of single decision-maker under proposed modifications to disability determination procedures). See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

impairments of osteoarthritis of the knees (status-post total knee replacement), degenerative disc disease of the lumbar spine, asthma, and obesity. (Id.) She had a history of DVT, which was successfully treated with Coumadin and did not appear to have any lasting effect on her ability to perform work-related activities, and of hypertension, which was well-controlled with medication. (Id.) She did not have an impairment or combination of impairments that met or medically equaled an impairment of listing-level severity, including Listings 1.02 (major dysfunction of a joint), 1.04 (disorders of the spine), and 3.03 (asthma). (Id. at 12.)

Next addressing Plaintiff's residual functional capacity (RFC), the ALJ determined that she can perform light work except she can only occasionally climb and cannot be subject to a concentrated exposure to extreme cold or heat, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards. (Id.) In reaching this determination, the ALJ reviewed the record and evaluated Plaintiff's credibility. (Id. at 12-18.) For reasons he then explained, he found Plaintiff's statements about her symptoms to not be entirely credible. (Id. at 14.) He noted that Plaintiff had regularly visited her primary doctor between January 2009 and October 2011, but there were no references to knee pain in those treatment notes other than a brief mention of her surgery. (Id. at 14.) Following her September 2011 arthroscopy of her right knee, Plaintiff recovered well and was walking well and exhibiting an unrestricted range of motion at the follow-up visit the next month. (Id.) Following complaints of knee pain and of the knee giving way in November 2011, Plaintiff had right knee replacement surgery. (Id.) By August 2012, she was walking well and was released from limited activity. (Id.) The following month, she was given over-the-counter medication, told to get "'vigorous'" with her

range of motion exercises, and told she did not need to return for six months.  (Id.)  As to her

back, physical examinations and tests revealed only mild to moderate pain or problems and

straight leg raises were sometimes positive and sometimes negative.  (Id. at 14-15.)  After

seeing Dr. Smith once for pain management, Plaintiff did not return and did not attend any

physical therapy as he recommended.  (Id. at 15.)  As to her asthma, her chronic cough

significantly improved with treatment, pulmonary function tests revealed only mild problems,

she did not use the medication as prescribed, and she reported no limitations caused by

breathing difficulties.  (Id.)  As to her obesity, the ALJ noted that Social Security Ruling 02-

1p considers a BMI of 40 or greater to be "'extreme' obesity" and that obesity combined with

other impairments might cause greater limitations than those other impairments alone.  (Id.

at 16.)  He considered Plaintiff's obesity when determining her RFC.  (Id.)

The ALJ found that Plaintiff "has not generally received the type of medical treatment

one would expect for a totally disabled individual."  (Id.)  The treatment she had received for

her various impairments was "essentially routine and/or conservative in nature."  (Id.)

Surgeries had provided relief for her knee pain.  (Id.)  Asthma medication, when taken, had

provided relief for her breathing problems and her cough.  (Id.)  Pain medication had been

prescribed for her back.  (Id.)  Also, Plaintiff "ha[d] not been entirely compliant in taking

prescribed medications, particularly for her asthma, which suggests that the symptoms may

not have been as limiting as the claimant has alleged . . . ."  (Id.)  She had not followed up on

doctors' recommendations.  (Id.)  She stopped work for a reason unrelated to any impairment,

and there was no evidence of a significant deterioration in her medical condition since then.

(Id. at 17.)  Her allegedly disabling impairments, "particularly the knee pain, [were] present at approximately the same level of severity prior to the alleged onset date."  (Id.)  The ALJ noted that no restrictions had been placed on Plaintiff by any of her treating physicians.  (Id.)  The opinion of Dr. Weis in support of her application for a parking disability card was conclusory, based on different criteria than applies in Social Security disability proceedings, and irrelevant to the ALJ's determination.  (Id. at 17-18.)  On the other hand, the opinion of Dr. Lipski was given substantial weight in that it was supported by the record.  (Id. at 17.)

The ALJ next concluded that based on her RFC, Plaintiff can return to her past relevant work as a personnel technician as she performed it.  (Id. at 18.)  She is not, therefore, disabled within the meaning of the Act.  (Id.)

## Standards of Review

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 423(d)(1).  Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months.  **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002).  Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy,

regardless of whether . . . a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work." 42 U.S.C. § 423(d)(2)(A).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'" **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting <u>Cuthrell v. Astrue</u>, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a) and 416.920(a)[6]). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." <u>See</u> 20 C.F.R. § 404.1520(b); **Hurd v. Astrue**, 621 F.3d 734, 738 (8th Cir. 2010). Second, the claimant must have a severe impairment. <u>See</u> 20 C.F.R. § 404.1520(c). A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." <u>Id.</u>

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. <u>See</u> 20 C.F.R. § 404.1520(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

---

[6]Unless otherwise indicated, all citations to the Code of Federal Regulations are to the revision in effect at the time of the ALJ's decision.

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the *Polaski* factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's

complaints.  **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past."  20 C.F.R. § 404.1520(e).  The burden at step four remains with the claimant to prove her RFC and establish she cannot return to her past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'"  **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001).  "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'"  **Partee**, 638 F.3d at 863 (quoting Goff

v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision.  **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935.  The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.

## Discussion

Plaintiff argues that the ALJ erred when assessing her RFC because he (a) gave too much weight to Dr. Lipski's opinion and too little weight to Dr. Weis' and (b) improperly analyzed her credibility.

Dr. Weis' and Dr. Lipski's Opinions.  On a Physician's Statement for Disabled License Plates completed in August 2012, Dr. Weis checked the box labeled "Permanent Disability" and checked the box by a definition of disability as being the person cannot walk 50 feet without stopping "due to a severe and disabling arthritic, neurological, orthopedic condition, or other severe and disabling condition." (R. at 548.)  Four months earlier, Dr. Lipski wrote that she agreed with a PRFC assessment completed by a single decision-maker finding Plaintiff capable of performing light work with a restriction against climbing and with some environmental limitations.  Plaintiff argues that the ALJ's decision not to give Dr. Weis' statement any weight and to give Dr. Lipski's opinion substantial weight is prejudicially erroneous.  As noted by Plaintiff, Dr. Weis is her treating physician and Dr. Lipski is a

nonexamining medical consultant. See 20 C.F.R. § 404.1502 (defining "treating source" as a claimant's "own physician, psychologist, or other medical source who provides [claimant], or has provided [claimant], with medical treatment or evaluation and who has, or has had, an ongoing relationship with [claimant]" and defining "nonexamining source" as "a physician, psychologist, or other acceptable medical source who has not examined [claimant] but provides a medical or other opinion in [claimant's] case").

"The regulations provide that if the ALJ finds 'that a treating source's opinion on the issue(s) of the nature and severity of [the applicant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and *is not inconsistent with the other substantial evidence in [the applicant's] record,* [the ALJ] will give it controlling weight.'" **Wagner**, 499 F.3d at 848-49 (quoting 20 C.F.R. § 404.1527(d)(2)). Thus, "while a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." **Id.** at 849 (internal quotations omitted).

Dr. Weis operated on Plaintiff's right knee in September 2011 and then saw her for one follow-up visit that same month and for two such visits the next month. In October 2011, she had a full range of motion in the knee. He next saw her in May 2012 for problems with her right wrist and, later that month, for a right knee replacement. At a follow-up visit the same month, he noted that Plaintiff had not been taking any medications for three days. He saw her for two follow-up visits in July 2012, at the first of which he instructed her to do range of motion exercises, and for one in August, at which time she had a range of motion in the right

knee of 0 to 90 degrees. Also at this last visit, he released her from limited activities. On the same day, he signed the statement for disabled license plates. The following month, he instructed her to "get vigorous about her range of motion exercises." (R. at 555.) As noted by the Commissioner, the license plate statement attributes the identified walking limitation as being caused by "a severe and disabling *arthritic, neurological, orthopedic condition, or other severe and disabling condition*." (Id. at 548 (emphasis added)). It does not, as required, identify *the nature* of Plaintiff's impairments. See 20 C.F.R. § 404.1527(d)(2).

Additionally, the statement is inconsistent with Dr. Weis' own records. "It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes." **Davidson v. Astrue**, 578 F.3d 838, 843 (8th Cir. 2009); accord **Turpin v. Colvin**, 750 F.3d 989, 993 (8th Cir. 2014). See also **Anderson v. Astrue**, 696 F.3d 790, 794 (8th Cir. 2012) (affirming ALJ's rejection of treating physician's opinions about claimant's exertional limitations that "[were] not reflected in any treatment notes or medical records"). On the same day he marked Plaintiff as being permanently disabled and unable to walk farther than 50 feet, he released her from limited activity. The month before, he directed her to do range of motion exercises.

The ALJ also discounted Dr. Weis' statement on the grounds it "conflicts with other substantial medical evidence contained within the record.'" **Wagner**, 499 F.3d at 849 (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir.2000)). For instance, with few exceptions, Plaintiff walked with a normal gait and had normal muscle tone in her lower extremities. See **Reed v. Barnhart**, 399 F.3d 917, 921 (8th Cir. 2005) (noting that the court

"[has] upheld an ALJ's decision to discount a treating physician's [statement of a claimant's restrictions] where the limitations listed on the form 'stand alone' and were 'never mentioned in [the physician's] numerous records or treatment' nor supported by 'any objective testing or reasoning'") (second alteration in original). Also, Plaintiff reported that she can walk one-quarter mile before having to rest. One-quarter mile is 1,320 feet – far longer than the fifty feet limitation in Dr. Weis' statement.

The checkbox format of the statement also lessens its weight. See **Anderson**, 696 F.3d at 794 ("[A] conclusory checkbox form has little evidentiary value when it cites no medical evidence, and provides little or no elaboration.") (internal quotations omitted).

In support of her argument that the ALJ erred by not giving greater weight to Dr. Weis' statement, Plaintiff cites **Shaw v. Astrue**, 2011 WL 4445830 (E.D. Mo. Sept. 16, 2011), and **Springfield v. Astrue**, 2010 WL 985306 (E.D. Mo. March 15, 2010). Reliance on neither is availing. In Shaw, the plaintiff argued that the ALJ had erred in failing to give controlling weight to the opinion of her treating primary care physician that she could not ambulate fifty feet without stopping to rest due to her condition. **Shaw**, 2011 WL 4445830 at *18. As in the instant case, the opinion at issue was in a physician statement for disabled license plates on which the physician had "simply checked a box next to the statement '[t]he person cannot ambulate or walk 50 feet without stopping to rest due to a severe and disabling arthritic, neurological, orthopedic condition, or other severe and disabling condition.'" **Id.** (alteration in original). Also as in the instant case, the physician had "checked a box indicating that plaintiff's disability was permanent" and had provided no additional information. **Id.**

Although, unlike in the instant case, the ALJ had given the opinion "some weight," the court held that the ALJ had properly concluded it had not established disability as such a finding was not binding on the Commissioner.  **Id.**  Similarly, in Springfield, the plaintiff argued that the ALJ had erred by assigning little weight to the opinion of her treating physician on a disabled parking permit application, the opinion having taken the same form as Dr. Weis' and the physician's in Shaw.  **Springfield**, 2010 WL 985306 at *20.  The court held that the ALJ had properly weighed the opinion as it was not supported by the other medical evidence, including the physician's own treatment records with his notation that the plaintiff had no medical restrictions.  **Id.** at *20-21.

Plaintiff further argues that the ALJ erred by giving Dr. Lipski's opinion any weight as it lacked a narrative discussion and did not consider all the relevant evidence, including Plaintiff's subsequent knee replacement and continuing back pain.

All evidence from nonexamining sources is considered to be opinion evidence.  20 C.F.R. § 404.1527(e).  "[An] ALJ is entitled to rely on the opinions of reviewing physicians when considering whether the claimant meets the requirements of a listed impairment."  **Ostronski v. Chater**, 94 F.3d 413, 417 (8th Cir. 1996) (citing § 404.1527(e)).  Dr. Lipski stated that she agreed with the opinion of Ms. Hamilton, a single decision-maker.  Ms. Hamilton's PRFC assessment did include a narrative discussion.  Plaintiff contends, however, that Ms. Hamilton's assessment is lacking in that it only addressed her asthma and osteoarthritis and only considered Listing 1.02 and not Listing 1.04.  This omission is not prejudicial.  Listing 1.04 requires limitations resulting from "distortion of the bony and

ligamentous architecture of the spine and associated impingement on nerve roots . . . or spinal cord." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.00(K). There is no evidence in the record of such impingement on Plaintiff's spine. See e.g. **McDade v. Astrue**, 720 F.3d 994, 1001 (8th Cir. 2013) (rejecting plaintiff's claim that he satisfied Listing 1.04 because, although there was evidence he suffered from spinal stenosis, there was no evidence of nerve root or spinal cord compromise).

Nor was the timing of Dr. Lipski's opinion prejudicial. Although Plaintiff thereafter had right knee replacement surgery, she was subsequently released from a restriction to limited activities placed on her by the surgeon, Dr. Weis. The complaints of back pain made in 2012 before Dr. Lipski's April opinion were in January, when Plaintiff complained of mild back pain for the past month. Two weeks later, she had full motor strength and negative straight leg raises. Two days later, she had some complaints of low back pain when consulting Dr. Summa about a cough. The next day, she had a normal gait and muscle tone. The next month, she had negative straight leg raises. There ae no other complaints of back pain until January 2013 when Plaintiff complained of *mild* back pain for the *past month*.

For the foregoing reasons, the ALJ did not err when weighing Dr. Weis' and Dr. Lipski's opinions.

Credibility Assessment. Plaintiff next challenges the ALJ's determination that her subjective complaints were not fully credible. Specifically, Plaintiff contends that the ALJ erred by finding she underwent routine, conservative treatment; did not comply with treatment recommendations; and had been able to work with the same conditions cited as disabling.

"'If an ALJ expressly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination.'" **Boettcher v. Astrue**, 652 F.3d 860, 865 (8th Cir. 2011) (quoting Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008)); accord **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011).

A proper consideration when evaluating a claimant's credibility is the presence of any precipitating or aggravating factors. See **Wagner**, 499 F.3d at 851. See also **Schultz v. Astrue**, 479 F.3d 979, 983 (8th Cir. 2007) (finding the lack of such factors supported ALJ's adverse credibility determination). Plaintiff alleged a disability onset date of October 22, 2010. She has had problems with her knees since 2004 and testified she has had low back pain for years.[7] Her shortness of breath and chronic cough problems, present since at least January 2009, were controlled by asthma medication. Her DVT problems, also present since at least January 2009, were controlled by medication. "An impairment which can be controlled by treatment or medication is not disabling." **Estes v. Barnhart**, 275 F.3d 722, 725 (8th Cir. 2002).

"Absent a showing of deterioration, working after the onset of an impairment is some evidence of an ability to work." **Schultz**, 479 F.3d at 982-83. Accord **Goff**, 421 F.3d at 782. Plaintiff argues that her condition has deteriorated. For instance, she testified that her back pain worsened in the past few years. Her complaints of back pain never identify it as of any long duration or of any severity greater than moderate. Her first complaint of back pain after

---

[7] The Court notes that she also testified in March 2013 that the back pain had worsened in the past two or three years. The deterioration of her impairments is addressed below.

October 2010 was in August 2011 when she complained of back pain that had begun the day before and was moderate. Even so, she had a normal gait, normal motor strength, and negative straight leg raises. Five days later, she again complained of back pain, this time describing its inception as being two weeks earlier. Straight leg raises were positive on the right. Her next complaint of back pain was in January 2012, when she described it as being low and present for the past month. Two weeks later, when she consulted Dr. Smith for her back and leg pain, she had negative straight leg raises. The following month, when being cleared for knee surgery, she again had negative straight leg raises. Her next complaint of back pain was in January 2013, one year after her last complaint and again described it as having begun only the month before. She appeared to be in mild pain. Straight leg raises were negative; gait and motor strength were normal. See **Turpin v. Colvin**, 750 F.3d 989, 993, 994 (8th Cir. 2014) (finding failure to seek regular medical treatment may detract from a claimant's credibility and affirming adverse credibility determination when complaint of pain was not followed by additional treatment). And, the MRI of her lumbar spine revealed only mild to moderate conditions. See **Medhaug v. Astrue**, 578 F.3d 805, 816 (8th Cir. 2009) (affirming adverse credibility determination when repeated studies failed to support allegations of deterioration in functional abilities ).

Plaintiff's claim of deteriorating knee impairments is similarly unavailing. She twice had arthroscopy of her right knee and then had a right knee replacement. After the arthroscopies, she had a normal gait and muscle tone. After the replacement, she was released from limited activities. Moreover, Plaintiff testified she had had three surgeries on each knee,

some of which apparently occurred before her alleged disability onset date because they are not reflected in the record.

Plaintiff also disagrees with the ALJ's consideration of her failure to follow treatment recommendations as detracting from her credibility. "'A failure to follow a recommended course of treatment . . . weighs against a claimant's credibility.'" **Wagner**, 499 F.3d at 851 (quoting Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005)). When treating Plaintiff for her left knee pain, Dr. Gross recommended she lose weight. She did not. When treating her complaints of a chronic cough, Dr. Summa recommended she take asthma medications as prescribed[8] and follow an exercise regimen. She did not routinely do so. Dr. Summa also recommended she lose weight. Dr. Smith recommended she have physical therapy. Although, as noted by the Commissioner, she had opportunity to do so between gallbladder surgery and her knee replacement, she did not.

The ALJ also found it relevant to his credibility determination that Plaintiff stopped working for a reason – her job was relocated to another state – for a reason unrelated to her medical condition. See **Medhaug**, 578 F.3d at 816-17 (affirming ALJ's credibility determination and noting that date claimant was laid-off due to decline in work was same as date of alleged onset of disability); **Goff**, 421 F.3d at 793 (claimant's leaving work for reason other than disability was proper consideration in credibility determination).

---

[8]Plaintiff argues that her failure to be compliant with her medications is attributable to her lack of understanding of her treatment regimen, a lack caused by her low IQ. There is no evidence of such a link. Although Plaintiff's IQ scores place her within the borderline range of intellectual functioning, the IQ test was administered when she was sixteen and she was able to work for the Army for twenty-seven years thereafter.

## Conclusion

An ALJ's decision is not to be disturbed "'so long as the . . . decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'" **Buckner**, 646 F.3d at 556 (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)). Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Order of Dismissal shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  16th  day of April, 2015.